oral argument, 15 minutes for the plaintiff, 15 minutes to be shared by the defendants, an intervener, and five minutes for the amicus. Mr. Ellison for the appellant or plaintiff. Good afternoon. Phillip Ellison appearing on behalf of appellant Donald Freed. With the court's permission, I reserve five minutes for rebuttal. Yes. The Supreme Court has explained that the measure of damages in a takings case is what the owner has lost, not what the taker has gained. This court recently in Hall echoed the Supreme Court's Phillip decisions in explaining that governments may not sidestep the takings clause by disavowing traditional property interest. Equity in real property has long been an existing confirmed understanding under our law. Both Gratiot County and its treasurers should answer in damages for those takings violations. But even if this court were to adopt the surplus proceedings methodology as your colleagues at the Michigan Supreme Court did for takings violations under the Michigan Constitution, the situation here has resulted in an excessive fine by the seizure of nearly 60% of Mr. Freed's equity. And it was seized because it was done to deter or otherwise punish him for not having paid his taxes in full and on time. Also, the issue that you have before you today is the issues of banal, which I will address somewhat on this opening aspect for limited time. And I also will be addressing that the state of Michigan has intervened in this case and should be subject to a judgment and should have been done by the district court in this case. I would ask this case to reverse and remand based on the relief that I've asked on my opening brief. Mr. Ellison, can I just ask you about your Eighth Amendment claim? Why isn't it foreclosed by Judge Kethledge's decision in the hall? So the last line of that decision says we agree with the district, we adopt the district court's reasoning. And for that reason, the Eighth Amendment claim fails and the district court's reasoning was that the Michigan GPTA is not punitive. And it has to be punitive in order to fall under the excessive fines clause. So why aren't we bound by that? I don't think you're bound by that because there was very little analysis that was, first of all, done in that aspect of it. I acknowledge it was referencing, of course, a district court case, but Hall was decided before Tyler was issued. A majority in Tyler doesn't address the Eighth Amendment claim. Well, the majority just declined. They didn't reject that theory. Justice Jackson and Justice Gorsuch have offered a very strong concurring opinion in the fact that many of the arguments that were adopted and utilized by the district court in Tyler were the same arguments that were adopted by the district court in Hall. And so the guidance that the concurrence provides in that respect, I think, is a strong indication to this court that the decision of the Eighth Amendment or the Eighth Circuit on this matter should be vacated. Now, I will add to that, the Eighth Circuit, upon remand from the Supreme Court, vacated its Eighth Amendment analysis and remanded it back for a district court to basically start anew. So the reliance that I've seen from most of my colleagues in their briefing, when the briefing was ultimately due, when the Eighth Circuit Tyler decision was pending, they've referenced that decision as being somehow helpful for this court. And I think that the Tyler decision at the Supreme Court level is something that this court should not, as Justice Gorsuch says, not make those same mistakes. Well, but fine, but there's no, we have a holding of this court, we're bound by this court holding unless the Supreme Court abrogates our decisions, right? However, I would suggest to you that the decision in Hall is factually different than if the court is not satisfied with that answer. I guess I would start by saying is, I think the court can distinguish Hall's conclusion in that in Hall, the victims of the tax foreclosure process never had their property subject to a tax auction. Whereas here we had Mr. Freed's property subject to an auction that resulted in not the complete aspect of the payment for all of his entirety of his equity. Now, I would suggest to this court that I think this court can provide that fair market value is the standard under the takings clause and takings clause alone and need not reach the Eighth Amendment claim. And I think the court would be well bound to do that based on the precedence that I've laid out in the brief on this, that fair market value is the complete value of the property and all interest that they had in that property at that time. But if the court is not inclined to do that, I think that the Eighth Amendment, and all I can rely upon is that fact that there was very, very sparse analysis by the Hall decision to be able to dictate whether or not this is in fact an Eighth Amendment claim is precluded. And I would ask this court to either follow Tyler's concurrence or to otherwise distinguish it on those grounds, that the fact that this factual setup is different than the factual setup in Hall. What do you make of also going back to Hall? So I understand that your claim is for the, you want the equity in the home. So you want the fair market value of the home, but doesn't Hall tell us that the, I mean, there's a line from Hall where it says the, basically the surplus is the equity. The surplus is the embodiment. The surplus is merely the embodiment in money of the value of that equitable title. But I think implicit in that, and I think the best, implicit in that statement is that the surplus that would generate is based on the fact that the government got either the fair market value or fairly close to the fair market value at a auction. What I would point this court to, I think to support that is Justice Viviano of the Michigan Supreme Court's concurrence in the Raffaelli decision, where the presumption in some of these cases that are coming to this court is that the auction is getting the fair market value price. This case is distinguishable in the fact that we know what the uncontested fair market value of the property is. It's approximately 98,000. In fact, I can tell you, it's $98,400. That was not contested by defendants below. The tax auction itself did not fetch anything close to the fair market value. In fact, less than half, and I've been calling it 40%. It may be 40 with some change one way or the other, but approximately 40% of the fair market value. That is insufficient to cover what I think is the wrong that occurred here is that in the fact that the difference between what Mr. Freed had and what he didn't have after paying all of his taxes, penalties, late fees, and interest of about $1,100 has been taken from him. Now, whether this court wants to treat that as a takings issue going forward, based on the language that the federal courts and the U.S. Supreme Court have done, and I would point this case or court to cases like Allmont Farmers to Miller to in fact in Rose. Now, I acknowledge Rose is an unpublished decision of this court, but the Rose decision, which I believe Judge Gibbons was on, that the loss that was suffered there is that the county never refunded the difference between its fair market value and the taxes owed. That difference was, in that case, Ms. Rose's equitable interest in her property. Was this auction in the public and notified the public to come in and bid on it? The auction was a public auction in that it was handled at the courthouse itself. However, there was a large number of rules. You had to show up with cash. You couldn't use mortgage properties. You couldn't inspect the property ahead of time. Many of the things that would cause a de-price or what we call a fire sale or an auction sale is something that I think unfairly drives down the price of that because it's a high amount of risk that has to be factored into those transactions. So many people who could have bought that property based on its condition simply weren't willing to take that risk. I would point this court to, to support that aspect, I would point this court to MCL 200.27. When Michigan determines its valuations, and I would note for the court that Michigan annually has to determine the fair market value of the property of each individual piece of property in the state. The one thing that the statute itself recognizes is that any auction sale or any forced sale is not a true reflection of its fair market value. Now, fair market value in Michigan is called true cash value. They're synonymous, and I've outlined that, of course, in my footnote in the top slide brief. But that being said, the point of this is that that auction price could have resulted in a fair market value sale. But in this case, it did not because of all those considerations. Mr. Ellison, I don't want to interrupt you, but for some reason, I cannot see the timer. It's not on my screen. I have about 30 seconds it says. So I needed to be able to let the court personnel know that so that they can fix that so that I'll have some way. How much time did you say you had left? Well, about 30 to 40 seconds when you started talking to me. Well, I was pretty close, wasn't I? You are. I guess I'll just finish up. I wanted to address one last point. The argument that I have presented that qualified immunity does not protect Treasurer Thomas, I relied heavily on the Lawton case. And I think Lawton provides the clear notice to Treasurer Thomas as a reasonable officer that keeping the surplus proceeds is, in fact, a violation of the Fifth Amendment. And I think if this court looks to the language in Tyler, which just came out and said this is a long established precedent, it adds further support to my argument that qualified immunity is something that does not protect the Treasurer in these circumstances. I've used up 35 seconds. I'm willing to go any other questions that the court may have, but I am out of time based on the timer that Judge Givens can't see. Well, I can now see it thanks to some technical help from staff. Thank goodness for staff that way. I can operate without them. And my colleagues. We can see it. I can. Okay. No questions. All right. Thank you, Your Honors. Thank you. All right. You'll have your vote. I think Mr. Curlew is arguing next. No, we decided to switch up and let the Attorney General speak first. He's rather centrally focused on the one issue, whereas I have a couple that will feed off of his much more comprehensibly. So we swapped yesterday and decided that Mr. Hodges would go first. Okay. That's fine. Good afternoon. May it please the Court, Assistant Attorney General for the State of Michigan, Matt Hodges, appearing for the intervener. You must have divided your time a little bit differently. Is that right? We did. Okay. Yeah. All right. Okay. You may proceed, Mr. Hodges. Thank you, Your Honor. This afternoon I would like to focus, as Brother Counsel said, on one argument, and that would be Mr. Freed's theory of damages. I think it follows nicely from the discussion we just had. Here he concedes the amount the county is allowed to keep, the aggregate taxes and collection costs. He's really focused on that top-line number. I mean, that's my phrase, but that's where we start and what we subtract from. He seeks the value based on conditions prior to foreclosure without duress rather than the result of a public market-based sale, which was what occurred here. He argues as if this is a condemnation or eminent domain case, but it's not. And ultimately, I think that's why Mr. Freed's argument has to fail, because context matters. This is a collection case. That's the thing that I think the court needs to focus on and remember. This is a situation in which a creditor of the county had to secure a court order to collect property taxes that were many years in arrears, sell the property, and then take those proceeds to pay the taxes. And now the district court has ordered the remainder, what's left over, Mr. Freed is entitled to. Mr. Ellison suggested that the auction that they had was kind of fishy because it didn't send out enough notice or they had too many restrictions on it. What about that? I don't see any of those allegations in this case. And frankly, it's been a blanket summary assertion that they're entitled to this value based on the tax assessment prior to foreclosure with no duress. And there's been a change in circumstances. And frankly, I think the U.S. Supreme Court has given us some guidance in this to say that we don't look so much at the exact result. I think Mr. Ellison just said it could have resulted in the value that would have been appropriate in his view. Just in this instance, it didn't. That's an awfully difficult standard for a court like this to review. And the U.S. Supreme Court has told us you don't need to. You look at the process. Was there an open market sale? And I think we get there. Unfortunately, it comes from a decision that's not really briefed here, but it comes up four times in this court's hall decision. And it's the U.S. Supreme Court's decision in BFPV Resolution Trust. It talks. It's a different context, which is why I probably didn't make it into our briefing here. But it's a bankruptcy issue. And the question was whether a mortgage foreclosure under California law resulted in fair value or whether it should be voidable under the bankruptcy code. And the court said, let's let's not look at the exact result each time. Let's look at whether there was a sale under that state law. And was it an open market sale? And let's after that, we're not going to look too closely because we have these issues, these concerns of federalism, this disrespect for the dual sovereignty. So I think that's why this case, why this theory of the case has to fail. It fails to consider context. This is a collection matter. You cannot apply a standard for valuation prior to foreclosure to a post foreclosure sale in a collection action. All this idea that a taking is based upon the value lost and not the value gained. That's that's true. If we were in a condemnation case, if we were in an eminent domain case, some sort of regulatory taking. This is a collection action. It's totally different. And I think you'll see that that's the thread. And it escaped me for the longest time until I read through all again. And you look at the case law there and the case law and the Michigan Supreme Court's decision in Raffelli and even in Tyler more recently. All of those cases talk about situations where there is either a sale or not a sale. If there's not a sale, they have a right to claim the equity. It remains this sort of open question that needs to be proved. But where there's a sale, as just Judge Larson noted, the two merge. If there's a sale and it's an open market sale and it seems to be fair and it's under the circumstances in a collection case sufficient marketing, then the two merge. The result of that sale is the equitable interest is the market value, whichever term you'd like to use. I think that's sort of the same reason why the Eighth Amendment argument has to fail here. But I'll leave that to further counsel. I'm sorry. Someone asked the question. Oh, OK. I thought I was stepping on someone. I think in this in this context, again, I wish it were brief here, but I would urge the court to look at the analysis and BFP Resolution Trust. It's referenced, as I said, four times in the whole decision. The whole decision looks at the issue from the opposite side of the coin, if you will. The court looked at a situation where there wasn't a sale. And in that instance said, well, by virtue of not holding a sale, you don't get to hold yourself harmless and say, well, there's no proceeds left. But in in getting there, it had to analyze the Michigan Supreme Court's decision in North Valley and say, well, why do you have a claim to the sale proceeds at all? It doesn't spring from nowhere. I think they use the phrase quantum mechanics in that decision. And they said, no, it arises from the idea that you had an equitable interest in the property throughout. But it essentially has been liquidated at the time there is a sufficient market sale and it becomes the proceeds from that sale. As I said, plaintiffs have already conceded the amount the county gets to deduct from that number. So we know what the number should be in terms of the damages here. It's not an open question. I've been I didn't mean to filibuster. I don't know if anyone has any any questions. I haven't taken much of a breath here. Are these auctions that they have on a debt like this, are they open to the public? Are they notified through the papers or some other form so anyone can bid on it? Yes, they are. And I don't want to speak too specifically because I don't know in this instance. I'm trying to remember. This would have been a sale. This goes back pretty far. I believe in this instance there would have even been phone and Internet bidding. I don't know if this one would have been in person. I don't I don't know the specifics of this one. We handle foreclosures now in six counties and properties. Now, I'm not speaking to this particular instance are advertised online for a couple of months. And then there's a competitive bidding process where you can continue to roll bids in through that whole time and they take the highest bidder. And of course, like any option, there are you do have to register. You do have to show the ability to pay. In some instances, they do take cash because it closes that day or you need to, within 24 hours, go get sufficient funds. They don't offer warranty deeds. These, to my knowledge, are our quick claim deeds, at least in the counties we handle. But these are not faults. These are not. I believe the briefing talked about it destroying equity or calling it a taking or calling an excessive fine in an instance where the proceeds from the sale are available. It's none of those things. It is a function of being a collection case. The Supreme Court has recognized that they say there are basically two different markets. There's the market before duress and there is the market that we expect to have duress in a collection case. And we accept that. Mr. Hodges, I know I'll ask Mr. Ellison this too, but do you think that Mr. Ellison argues about the validity of the process here? I didn't really get that out of the briefing, but. I do. I do. I think it's an indirect attack because I'll tell you really quickly, if this goes forward, if the equity is an open question, it's not bound by the result of an otherwise fair and open public sale. We're talking about blowing up the entire system. We're talking about the new law that was remedial and passed to address the situation in Red Belly. That goes away. That does not work because that provides for this exact process with the district court held. You get the proceeds from the sale and nothing more. OK, I see my time is up. I'd ask that the court on that issue affirm. Thank you. All right, Mr. Curley. Yes, thank you, Douglas. On behalf of Treasurer Thomas and Gratiot County, I wasn't going to address really the 5th or the 8th Amendment per se. I have two other issues I want to address, but I do want to do some housekeeping for the benefit of the court. In the record at R29-8, page ID 477 are the actual numbers. Mr. Ellison represented that the attacks of rearage with fees and all was just over $1,000. In fact, it was $4,218.50. So after the $42,000 public auction sale, the surplus proceeds would have been $37,781.50. I also want to make one last note about the 5th Amendment before I move on to the topics I was really to address. And that is, if you look at the Raffaelli opinion out of the Michigan Supreme Court, you look at this court's Hall opinion and you look at the Tyler opinion from the Supreme Court. There's this remarkable unanimity of the way they approached it from a historical perspective. I have a Ph.D. in history, so I always am attracted to opinions that talk about history. And all three of those opinions went back to the Magna Carta. In fact, this court's Hall opinion went back to Glanville. And their conclusion was that throughout the history of the foreclosure process, as it developed both in the English common law, the inequity, and in the United States, the ultimate value of the property to be considered for compensation, as Judge Larson said, the sale proceeds are the embodiment of the equitable interest that has been lost. Now, to move on to what I really wanted to address in building on what was said, we have, again, Mr. Ellison talking about he wants not only compensation, he wants damages from the treasurer, damages from the county from their supposed violations of the Constitution. As I think pretty well covered in my brief, certainly the treasurer has qualified immunity. There was no basis for any treasurer in Michigan, including Treasurer Thomas, to know that there was anything unconstitutional about keeping the proceeds and conducting things in accordance with the statute. Statutes are presumptively valid, especially taxing statutes. And the Michigan Court of Appeals had upheld this statutory system. They had said that the limitations on disbursements were mandatory and that to act otherwise was ultra viris. And again, it's the courts that make these decisions. I've cited in the brief cases that say until a court rules otherwise, executive and administrative officials should be able to rely upon the law as it's written. Mr. Ellison keeps citing the Lawton case. The Michigan Supreme Court itself and Raffaele addressed Lawton and pointed out it really didn't help with the problem because it was a statutory right under a federal statute. So it gave no notice as to what would be required under the Constitution or under Michigan law at all. So I think that certainly the treasurer has immunity against these claims. If there is to be a claim, a surplus proceeds claim under Raffaele, at most it is an inverse condemnation claim against the county itself. As far as the county itself, though, I want to point out that Mr. Ellison escaped the original jurisdictional dismissal of his case by convincing this court that what we're talking about here is only what has happened after the foreclosure is over, whether or not the treasurer pays a refund of proceeds or of some sum of compensation. And I think that's a key distinction as to the timing of what's going on here. He says that the reason we can hold the county or the treasurer in official capacity liable under the federal law is because this was a policy of theirs. They fall within Manel, he says. What happens after the sale, as far as refunds, has nothing to do with anything the county chooses. The county chose to have its treasurer act as the foreclosing governmental unit. But as we pointed out, Mr. Ellison saved his case from jurisdictional dismissal by saying we're not dealing with the foreclosure here. We're dealing with the compensation afterwards. Disbursement of funds after the foreclosure sale, whether the county chooses to be the foreclosure. Didn't you when you when you elected to be the foreclosing unit, that means you're the foreclosing unit. You conduct the sale and under the old scheme, you keep the surplus. So when you elected to do that, didn't you sort of take the whole elect like buy into the whole statutory scheme? Like, why is that not chargeable to the county? No, because even if the county had chosen not to have the treasurer act as foreclosing governmental unit, they still would have been limited on the disbursements by MCL 211.78 M8, which sets forth an exclusive enumerated list of what you can do. I understand that. But let me maybe I just don't understand how this works. So if you had not elected to be the foreclosing unit. The state itself would have been the foreclosing unit and the state would have held the auction and the state would have kept the surplus. And the state would have been the one who wouldn't have given them the refund. So why isn't it like you take the whole package when you elect? Because choosing to be choosing a member, we're talking about what happens. The foreclosure is what you've chosen to do. You can do with the money is a separate issue. It's the later issue. It's what comes after the foreclosure. What can I do with the money? Doesn't matter who does the foreclosure, whether it's the state, whether it's a county, no matter. The state legislature has set. This is our enumerated list. And the state court of appeals has said you must. Let's take a hypothetical. Like, let's say that you could prosecute certain crimes or not. At the state could be the prosecutor or you could be the prosecutor and there's a penalty attached to it. So it's a life without possibility of parole for a juvenile offender. That's the statute. So we know that violates the 8th Amendment, but we didn't know it at the time. You elect. I'm going to prosecute. So I'm taking this mandatory punishment with me. Wouldn't we say, like, you're on the hook, which we chose to prosecute, but we didn't choose what the penalty would be. The penalty was enumerated by the state legislature. Now, I'm not saying let me be clear. I'm not saying that there's no state law. Raffaele claim for inverse condemnation for people to seek compensation. What I'm saying is that this does not fall within Manel to create a federal liability under the fifth or the eighth or whatever other amendment you might choose to make it. The compensation is to come under state and we are outside of what Manel would allow, because the treasurer and the county have no choice with regard to this aspect of the process. It's a policy choice of the legislature. I see my time is up. But if there are questions, I'll certainly certainly try to answer. We'll turn to you, Mr. Seitz. Good afternoon. May it please the court, Ted Seitz, appearing on behalf of the Michigan Association of County Treasurers. The county treasurers appreciate the court giving them an opportunity to participate in oral argument today. I wanted to, of course, focus on some of the arguments that have been made here in the court's questions and talk about kind of globally in Michigan where this sits. And we know that there's been a deluge of litigation, as this court had described in the Garcia case dealing with Michigan's former tax foreclosure process before it was amended. The current argument by free entitled to fair market value has already been addressed and rejected by the U.S. Supreme Court in Hennepin County. And basically, as Judge Larson pointed out in the Hall decision as well, the value here is the surplus proceeds. There was an option. That is the amount that was not distributed back to Mr. Freed. There wasn't a mechanism in place at that time to do that. So the surplus proceeds, since there was not an avenue for Mr. Freed to obtain that at that time, is there an avenue today? Has that been changed now? Yes, that has, Your Honor. And that's a big part of this. So the Michigan legislature, in direct response to the Supreme Court's decision in Raffaelli, enacted a process for people to claim, if they have an interest in foreclosed property, the surplus proceeds. And that's been operational for about three years. And it was passed in December 27, 2020, unanimously by the Michigan legislature. And enacted in what's called Public Act 255 and Public Act 256. And that process in the statute is labeled MCL-211-78T. So they have addressed that. As I mentioned, they did it unanimously. And frankly, a holding here by this court, which, you know, our view, completely unwarranted in light of Hennepin County and Hall, that Mr. Freed is entitled to some sort of fair market value measure of damages outside of the surplus proceeds, would potentially eviscerate Michigan's new law, allowing people to claim proceeds. Because I suspect what could happen would be, is that people would, instead of making a claim in a Michigan state court, a circuit court, as set forth under the Michigan law, would instead maybe go to federal court and make a claim and seek their fair market value for property that was foreclosed and sold. Okay, but if that's what the Constitution requires, then they get to come here, right? They certainly do, Your Honor. They certainly get to come to federal court now. But, you know, the U.S. Supreme Court in Hennepin County, we would argue, and Hall as well, would be that that would still be limited to the surplus proceeds. So that's the real question, not whether or not the state has some mechanism that's not going to get used and we're going to get more lawsuits. As we know, there's already a lot of lawsuits pending on this process, and there have been, and they're still pending on class actions and other basis, Your Honor. So, yes, but that is a concern, certainly to the treasurers, to the counties. I mean, they have been handling these claims now for several years. And the Michigan legislature, as I said, unanimously put this process in place, and it's been working. And we don't want anything to infringe on that process. I just wanted to comment, because I only have 40 more seconds left, on the Eighth Amendment claim, because I know Mr. Ellison mentioned Hall and the reliance on the district court opinion. And I would like to note that the Hall Eighth Amendment portion of the opinion was subject to a cross-cert petition to the U.S. Supreme Court that the U.S. Supreme Court denied in June of this year. So that issue wasn't from the Supreme Court if they wanted to take up the Eighth Amendment claim from Hall and the analysis, and they chose not to do so. Unless there's any other questions, that's all I have. All right, we're back to you, Mr. Ellison. Thank you. Just, I want to just mention that Mr. Seitz failed to mention just now that the 78T process is only available for those after Raffaelli at this current time. There is no process available for anyone from the timeframe from all the way back to the applicable statute of limitation through Raffaelli, which of course is why Judge Friedman decided this case in the manner in which he did here. The problem with the argument that I keep hearing today is about the sky is going to fall if the court recognizes that the takings liability here and or the Eighth Amendment claim is fair market value methodology. That argument has been tried by the courts or been tried by governments in courts time and time again. And I would like to point this court to the Arkansas Game and Fish Commission case where the U.S. Supreme Court has said they have been told of this what they call the prophecy of recognizing that just compensation would duly impede the government's ability to act in the public interest. And they have rejected that argument to create blanket exceptions to the Fifth Amendment's instruction. So what is the Fifth Amendment's instruction? We have both with the cases I would point this court to is Alamont Farmers, which says the total value means the full monetary equivalent of the property taken. And I'd also point to U.S.V. Miller and both of these cases are cited in my brief. A takings government must pay the full market or the full and perfect equivalent in money of the property taken. But both of those condemnation cases, I mean, that would be Mr. Hodge's point that under Justice Scalia's opinion and I forget what the name of the case is, BFP, there's distressed property and not distressed property. But the distress was caused by the government here in the fact of the way that they foreclosed upon the property and then utilize a process by which an auction that didn't result in a fair market value or even close to fair market value. Do you attack the particular procedures by which they conducted this auction? I didn't really see that in your briefing. I was just going to address that. There was a notice, you had to bring cash. We did not. We did not in that respect. And it's difficult now because when this case started, as this panel well remembers, this case started in 2017. This is almost five years. It's been at this court on the second appeal for over two years. There has been a deluge, and I will agree with Mr. Seitz, a deluge of decisions that have come out since this case originally started before Raffaelli was decided, before Tyler was decided, before Hall was decided. And we didn't have the benefit of all of those analysis. Now, in retrospect, would I like to have attacked that in more detail? I absolutely would because I think it goes further to the respect about the fundamental fairness that exists for these types of auctions that don't reach either fair market value or close to fair market value. Because, again, the standard for Eighth Amendment, it has to be grossly excessive. So if, for example, and I'm just going to offer this as a hypothetical because I know, Judge Larson, you always throw our hypotheticals at us in this. Imagine if this case where Mr. Freed's property is worth $98,400 got $98,000 at an auction. I think that would probably result in a decision that this is not a grossly excessive fine for purposes of the Eighth Amendment, and it likely would be, I think, relatively close enough for Fifth Amendment purposes. But we don't have those facts here. What we have is a situation where an auction resulted in a sale price and an auction price that's approximately 40% of the government's own acknowledged fair market value of the property. Say whatever we want about the process. Say whatever we want about the sky is falling in this respect. Mr. Freed, for the fact that he didn't pay a portion of one year's taxes of $735 that ballooned to $1,109 at the time of the foreclosure with the costs and expenses on this, he lost his house of 40 years. Did he get notice of the auction? He did not get notice of the auction, I don't believe. But he did get notice. I will acknowledge he did get notice that it was going to be foreclosed on, but he couldn't read. He doesn't have, he's illiterate and could not read the notices. And the treasurer under the statute at the time was supposed to go out and give oral notice to the individuals who they're going to foreclose on, and the treasurer did not do that. So, the difficulty has been Michigan courts have been very hostile towards due process claims in this respect. So we opted to bring this case as a takings case coupled with an Eighth Amendment claim going forward. I would ask the court to grant the relief that we've asked for in our topside brief and remand for adjustment in the judgment. Unless the courts have any other questions, I appreciate your time today. Thank you for all the arguments you've given. And if there's nothing further, the court may adjourn the court.